***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement, at the hearing before the deputy commissioner and in the 4 June 2003 Stipulated Order as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Specialty Risk Services was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury on 2 December 2001, as a result of which defendants filed an I.C. Form 63 and a subsequent I.C. Form 60. Plaintiff received temporary total disability benefits pursuant to these from 3 December 2001 until 6 March 2002. She returned to work on 5 March 2002 at the same or greater wages, at which time the carrier filed an I.C. Form 28T.
5. Plaintiff's average weekly wage was $293.33, which yields a compensation rate of $195.55 per week.
6. The issues for determination are:
a. What are the compensable consequences of the admittedly compensable claim?
b. Have defendants provided suitable employment to plaintiff?
7. The parties stipulated the following documentary evidence into the record:
a. The Rehab Center — twenty-six pages;
b. Hart Industrial Clinic — twenty-one pages;
c. Frye Regional Medical Center — seventy-three pages;
d. Charlotte Radiology — two pages;
e. Piedmont Hand Therapy — twenty-five pages;
f. Northlake Medical Center — four pages;
g. Carolina Orthopaedic Specialists — three pages;
h. Hickory Family Practice — 106 pages; and
i. I.C. Forms 18, 19, 63, 28T, 60, 33, 33R, and 25R.
8. The issue presented at the hearing before the deputy commissioner was whether plaintiff's current employment constituted make work. Since the date of the hearing, plaintiff's employment with defendant-employer has terminated, effective 12 May 2003.
9. The issues for determination, per the 4 June Stipulated Order are
a. Whether plaintiff is entitled to weekly indemnity benefits, effective 13 May 2003? and
b. Whether there exist other compensable consequences, as a result of the compensable injury?
10. Pursuant to Seagraves v. The Austin Company of Greensboro, defendants bear the initial burden of proving plaintiff was justifiably terminated for just cause and not for reasons related to her compensable claim or physical restrictions. If defendants meet their burden, plaintiff then bears the burden of proving ongoing disability.
11. The depositions of Dr. Timothy Kirkland, Dr. James Hodges, Dr. William Van Ness, Dr. Paul Lafavore, Dr. T Kern Carlton, Patricia T. Justice, Ralph H. Hall, Tony P. Owen and plaintiff were submitted and received into evidence subsequent to the hearing before the deputy commissioner.
 ***********
Based upon all of the competent evidence the record, the Full Commission makes the following
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was fifty-six years old with an eighth-grade education. Plaintiff worked as an environmentalist, or housekeeper, at the defendant's hospital facility. Her duties included performing routine housekeeping work as well as thorough cleaning of labor and delivery rooms. Cleaning rooms required plaintiff to strip the linens, empty trash, dust the room, and clean and mop the floors and bathrooms. In the course of cleaning the beds, she had to disinfect furniture and bed springs.
2. Prior to the compensable injury, plaintiff has treated with family physician Dr. James Hodges for her high blood pressure and other conditions. Although plaintiff contended her high blood pressure was due to her work-related injury, there is no competent evidence to support such a finding. Plaintiff has continued to treat with Dr. Hodges for this condition.
3. On 2 December 2001, while spraying disinfectant on a bed, plaintiff experienced a crush injury when the raised foot of the bed fell, striking her left hand. She was initially treated in the emergency room, where she was diagnosed with a large contusion over the second and third metacarpals and a small, non-displaced fracture through the third metacarpal.
4. On 7 December 2001, Dr. Allen Edwards of Hart Industrial Clinic placed plaintiff in a left wrist splint and prescribed Ultram. Dr. Edwards also ordered light duty work restrictions with limited use of the left hand. At the 2 January 2002 follow-up, plaintiff reported her left hand pain had worsened. Dr. Jay Piland found her pain complaints out of proportion to the physical examination.
5. Dr. Timothy Kirkland of Carolina Orthopaedic Specialists examined plaintiff on 17 January 2002, at which time he found moderate swelling with allodynia in the left hand. Based upon the physical findings, Dr. Kirkland diagnosed plaintiff with complex regional pain syndrome caused by the crush injury of 2 December 2001.
6. On 13 February 2002, Board Certified anesthiologist Dr. Paul Lafavore of Unifour Pain Management Center saw plaintiff on referral from Dr. Kirkland. On examination, Dr. Lafavore noted plaintiff had some swelling in the left hand and mechanical allodynia, or sensitivity to light touch. He diagnosed her with complex regional pain syndrome caused by the crush injury of December 2, 2001 and ordered a series of left stellate ganglion blocks. Plaintiff responded well to the first block. However, she had little or no relief from the second and third block.
7. Plaintiff returned to work on 5 March 2002 as an environmentalist at the same wage. She continued to perform housekeeping duties but was assigned to work in non-patient areas, including the West Building and Hill House. There were three to six other environmentalists who worked in these areas, and this assignment was one that was available to the general public and was necessary for the operation of the hospital.
8. Following her return to work, plaintiff began leaving work one to two hours early each day. Plaintiff experienced side effects from the medications she was taking due to her injury by accident. Plaintiff would leave early so that she could drive home in order to take her medications. Plaintiff informed defendant-employer that she was leaving in order to go home and take her medications. Operations Manager Tony Owens counseled plaintiff about her leaving early without a medical excuse. Plaintiff did not provide a medical excuse from Dr. Carlton and continued to leave early prior to the end of her scheduled shift.
9. On 11 April 2002, plaintiff reported to Dr. Kirkland that her pain was unchanged despite nerve blocks. Dr. Kirkland released plaintiff and advised that she was not a surgical candidate. He did opine plaintiff would benefit from the range of motion exercises.
10. A bone scan did not reveal any evidence of sympathetic dystrophy as of 16 May 2002.
11. Under the employer's attendance policy, which plaintiff received upon being hired, any employee who accumulates six unscheduled absences in a rolling twelve-month period is subject to a verbal warning as the initial step in the disciplinary process. In accordance with the policy, the employee will receive a written warning for seven unscheduled absences during the specified period, a suspension in place for eight such unscheduled absences, and termination for nine unscheduled absences. An unscheduled absence is a missed day or group of days, which is not approved in advance. According to the attendance policy, if an employee is absent and later provides a doctor's note excusing them from work, the absence will still be an unscheduled absence and would subject the employee to disciplinary action.
12. On or about 17 May 2002, plaintiff received a verbal warning for excessive (twelve total which were counted as nine instances) unscheduled absences from 20 June 2001 through 14 May 2002, in accordance with the employer's policy.
13. On 3 June 2002, physical rehabilitation and pain management specialist Dr. T. Kern Carlton of The Rehab Center diagnosed plaintiff with complex regional pain syndrome, type I. This condition is a chronic pain condition characterized by swelling; discoloration; sometimes changes in temperature, nail or hair growth on the extremity; and hypersensitivity to touch. On examination, Dr. Carlton found plaintiff had a cooler left hand, which was swollen, discolored, had allodynia and decreased sensation. He assigned plaintiff a two-pound lifting restriction with the left hand. He encouraged plaintiff to use her left hand as much as possible.
14. Plaintiff received a written warning for excessive unscheduled absences on 1 July 2002, for nine occurrences.
15. On 1 July 2002, plaintiff expressed problems with her medications and the possible affect on her driving, at which time Dr. Carlton instructed her to decrease the Neurontin and Hydrocodone, as well as rescheduling the times she took her medications to reduce the possibility of it affecting her driving. At the 29 July 2002 appointment, plaintiff reported Paxil gave her diarrhea, and she requested a work excuse for this, which Dr. Carlton provided.
16. By 12 September 2002, Dr. Carlton found plaintiff had reached maximum medical improvement and retained a ten percent permanent partial impairment to her left hand. Dr. Carlton also made the two-pound lifting restriction permanent.
17. On 4 October 2002, plaintiff received a three-day suspension for nine unscheduled absences.
18. On 7 December 2002, Board Certified physical medicine and rehabilitation specialist Dr. William VanNess examined plaintiff on a second opinion on referral by Mr. Helton, following which he diagnosed her with a crush injury and complex regional pain syndrome type I. Dr. Van Ness stressed the importance of exercise to plaintiff, in order to keep the movement she has. Dr. Van Ness specifically deferred to Dr. Carlton regarding whether plaintiff would benefit from further treatment. In addition, he also concurred with Dr. Carlton's assessment that the job duties were appropriate to the two-pound lifting restriction.
19. On or after 3 April 2003, plaintiff brought her employer a note from Dr. Hodges which indicated, "plaintiff requests that she work six to seven hours to allow her to get home" to take her medication. Although, Dr. Hodges was not the authorized treating physician for her chronic left hand pain syndrome, Dr. Hodges provided plaintiff with her medication prescriptions after Dr. Carlton had released plaintiff from his care on 12 September 2002,.
20. At plaintiff's request, Dr. Hodges prepared a note on 7 April 2003, which stated, "It would be advantageous to Violet if she could have a straight-in parking spot. Parking on a hill or in a side/angled parking spot is difficult for her with her physical disability." Again, at plaintiff's request, on 9 April 2003 Dr. Hodges noted, "She requests that she only work six to seven hours which would allow her to get home in time to take the (pain) medication." This was due to her concerns about taking the medication and driving.
21. On 14 April 2003, plaintiff was given a three-day suspension for sixteen unscheduled absences for failure to make up missed time, taking extra breaks, and for continuing to leave work early without authorization. Plaintiff was also instructed that should she be out of work due to medical reason related to her left hand condition, she would be required to provide a medical excuse upon her return to work.
22. Plaintiff was terminated for being absent from work forty-one days, resulting in sixteen unscheduled absences within a rolling one-year period, in accordance with the employer's attendance policy. This termination was directly related to plaintiff's compensable injury. Plaintiff repeatedly told defendant-employer that she was leaving early in order to take her medications. Plaintiff also suffered side effects of chronic diarrhea from the medication, Paxil, which resulted in unscheduled absences. Later, plaintiff attempted to provide a doctor's note to reduce the shift hours she worked. Although, the employer has consistently applied this policy to all employees, having similarly dismissed over ten other employees for similar absenteeism since June of 2002, even if an employee is able to provide an out of work note after an absence, that absence is still considered unscheduled and subjects the employee to disciplinary action. Plaintiff's termination was due to her physical condition as a result of her compensable injury by accident.
23. At her 17 June 2003 follow-up appointment with Dr. Carlton, plaintiff reported that her family doctor had changed her to Ultracet, which is a non-opioid analgesic. Plaintiff did not report any side effects of Hydrocodone to Dr. Carlton during this appointment.
24. Plaintiff testified at the hearing before the deputy commissioner and the Full Commission finds her credible that the majority of her absences following her compensable injury by accident were due to pain, inability to sleep and diarrhea.
 ***********
The foregoing findings of fact engender the following
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to her arm and left hand arising out of and in the course and scope of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. The position of environmentalist to which plaintiff returned on 5 March 2002 at the same or greater wages was not make work and was a position that was available to the general public and was necessary for the operation of the hospital. People v. Cone Mills Corporation,316 N.C. 426, 437, 342 S.E.2d 798, 805 (1986).
3. Defendant has failed to establish plaintiff was terminated from her employment for just cause as plaintiff was terminated for excessive absences that were directly related to her compensable injury. Seagravesv. The Austin Company of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397
(1996).
4. As a result of the compensable injury by accident, plaintiff is entitled to temporary total disability compensation at the rate of $195.55 per week for the period from 12 May 2003 and continuing until she returns to work or further order of the Commission. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1. However, as there is no competent evidence to causally relate plaintiff's pre-existing hypertension to the compensable injury, she is not entitled to have defendants pay for its treatment.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay plaintiff ongoing weekly benefits at the compensation rate of $195.55 per week from 12 May 2003 and continuing until further Order of the Commission. Said benefits shall be subject to a credit for any unemployment benefits paid to plaintiff. Those benefits, which have accrued to date, shall be paid in a lump sum.
2. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to counsel.
3. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
4. Defendants shall pay the costs.
This the 21st day of January 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DCS/llc